## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **EZEQUIEL CARABALLO-PACHE,** | * | |
| | * | |
| **PLAINTIFF,** | * | **CASE NO. 20-cv-0263-SCB-JSS** |
| | * | |
| **VERSUS** | * | |
| | * | |
| **BP EXPLORATION & PRODUCTION** | * | |
| **INC. and BP AMERICA** | * | |
| **PRODUCTION COMPANY,** | * | |
| | * | |
| **DEFENDANTS.** | * | |
| | * | |
| | * | |
| **\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*** | * | |

### PLAINTIFF'S UNOPPOSED MOTION TO MODIFY THE COURT'S SCHEDULING ORDER AND/OR EXTEND TIME

Plaintiff, Ezequiel Caraballo-Pache, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 16(b) and 6(b) to modify the Scheduling Order and extend the time for the parties to submit expert disclosures by re-setting the due date for Plaintiff's expert disclosures from March 22, 2021 to April 23, 2021 and re-setting the BP Defendants' expert disclosure deadline from April 23, 2021 to July 23, 2021. Further, Plaintiff respectfully requests the Court extend the discovery deadline from August 13, 2021 to August 27, 2021 and that all other pre-trial and trial dates remain the same and in force.[1] As explained more fully below, there is good cause to grant Plaintiff's Motion.

---

[1]    Counsel for Plaintiff has conferred with counsel for the Defendants and Defense counsel does not oppose Plaintiff's Motion provided that Defendants' expert disclosure deadline is extended until July 23, 2021, the discovery cutoff is extended from August 13, 2021 to August 27, 2021, and that all other pre-trial and trial dates remain in force. This agreement between the parties is not intended to have any precedential effect and was reached solely for this individual case.

## INCORPORATED MEMORANDUM OF LAW

### I. PROCEDURAL HISTORY AND BACKGROUND

1)     On April 20, 2010, the oil drilling rig Deepwater Horizon, operating in the Macondo Prospect in the Gulf of Mexico, exploded and sank, resulting in the largest spill of oil in the history of marine oil drilling operations. In total, an estimated 4.9 million barrels of crude oil flowed from the damaged Mississippi Canyon 252 (MC252) well over an 87-day period, before it was finally capped on July 15, 2010.

2)     The crude oil released from the MC252 well (referred to as MC252 oil) contained significant levels[2] of toxic substances known to cause cancer and other diseases in humans, including polycyclic aromatic hydrocarbons (PAHs)[3] and a combination of benzene, toluene, ethylbenzene, and xylene (BTEX chemicals).[4]

3)     On January 11, 2013, District Judge Carl J. Barbier approved the Deepwater Horizon Medical Benefits Class Action Settlement Agreement ("Medical Settlement") filed in the Deepwater Horizon Oil Spill Litigation, MDL 2179. Individuals who were clean-up workers during the response to the Deepwater Horizon oil spill are members of the class covered by the Medical Settlement. The Medical Settlement includes a Back-End

---

[2]     *See* Chemical Analysis for MC252 Oil, Attached as **Exhibit A**.

[3]     *See* Thamaraiselvan Rengarajan T, et al., *Exposure to polycyclic aromatic hydrocarbons with special focus on cancer*, Asian Pacific Journal of Tropical Biomedicine 5(3): 182-189, Attached as **Exhibit B**. ("Health effects from chronic or long-term exposure to PAHs may include decreased immune function, cataracts, kidney and liver damage (e.g., jaundice), breathing problems, asthma-like symptoms, lung function abnormalities; and repeated contact with the skin may induce redness and skin inflammation[25]. Naphthalene, a specific PAH, can cause the breakdown of red blood cells if inhaled or ingested in large amounts. With exposure to PAHs, the harmful effects that may occur largely depend on the way in which the individual is exposed . . . PAHs are ubiquitous environmental agents commonly believed to contribute significantly to the development of human cancers."); *see also Agency for Toxic Substances and Disease Registry Fact Sheet for Polycyclic Aromatic Hydrocarbons*, Attached as **Exhibit C**.

[4]     *See* EPA Hazard Summary on Benzene, Attached as **Exhibit D**.

Litigation Option ("BELO") procedure that permits certain class members who follow the procedures outlined in Section VIII of the Medical Settlement to sue BP for Later-Manifested Physical Conditions, as defined in the agreement.

4)   Plaintiff Caraballo-Pache was employed as a clean-up worker during the Deepwater Horizon oil spill response.

5)   Plaintiff was diagnosed with a Later-Manifested Physical Condition of Adenocarcinoma subsequent to his clean-up work during the Deepwater Horizon oil spill response.

6)   Plaintiff, Caraballo-Pache, filed this BELO lawsuit in 2019, claiming that his Later-Manifested Physical Condition was caused by exposure to oil, other hydrocarbons, and other substances released from the MC252 WELL and/or the Deepwater Horizon and its appurtenances.

7)   Under the Medical Settlement's Back-End Litigation Option, both parties have agreed that the Plaintiff shall be allowed to litigate the following issue at trial:

> The level and duration of the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S exposure to oil, other hydrocarbons, and other substances released from the MC252 WELL and/or the Deepwater Horizon and its appurtenances, and/or dispersants and/or decontaminants used in connection with the RESPONSE ACTIVITIES, and the timing thereof . . .

MSA § VIII(G)(3)(a)(iii).

8)   On February 12, 2020, a team of researchers led by University of Miami's Rosenstiel School of Marine and Atmospheric Science scientists published a peer-reviewed study in the journal of Science Advances through the American Association[5]

---

[5]   Formed in 1848, the American Association for the Advance of Science is the world's largest general scientific society and was the first permanent organization formed to promote the development of science of engineering at the national level. AAAS, https://www.aaas.org/mission (last accessed

for the Advancement of Science discussing the results of breakthrough research on the true extent of the Deepwater Horizon oil spill, titled "Invisible Oil Beyond the Deepwater Horizon Satellite Footprint." ("the Invisible Oil Study").[6] By applying a never-before used combination of technologies and science, the study's authors were able to calculate the spatial extent of the Deepwater Horizon oil spill, as well as the toxicity[7] of the released oil. The study concluded that satellite imaging conducted during the Deepwater Horizon oil spill failed to detect large amounts of toxic and invisible oil that spread throughout the Gulf during oil spill cleanup response activities. The study's findings directly contradict previously known data and estimates as to the extent, location, concentrations, and toxicity of oil released into the Gulf during the Deepwater Horizon oil spill. Further, this state-of-the-art science now allows for the ability for Plaintiff's expert to create a new scientific model to determine toxic and non-toxic concentrations relative to the location of the Plaintiff during the 2010 Spill. Previously, the possibility for such an examination did not exist.[8]

9)    The Invisible Oil Study's authors used three-dimensional computer simulations, which considered ocean currents, oil evaporation and other factors, to map

---

November 10, 2020).

[6]    *See* Invisible Oil Study, **Exhibit E**.

[7]    The Invisible Oil Study published in 2020 focused on toxicity to marine organisms in its study of the extent of the Deepwater Horizon spill and was able to demonstrate that large areas of the Gulf of Mexico were exposed to invisible and toxic oil. Dr. Perlin's model is necessary to provide the essential measure of exposure assessment required to demonstrate human toxicity to the same toxicants and compounds.

[8]    *See* Invisible Oil Study at 1, **Exhibit E** ("while some of these [prior] models provided possible scenarios of the DWH spill, *a robust spatiotemporal examination of the spill's extent, resolving toxic and nontoxic concentrations, does not exist for the DHW*. Similarly, the relationship between satellite detection and in situ oil concentrations was rarely examined. *This is a key point because satellite detection is the main source of information used for determining the oil spill extent* and the corresponding management actions, e.g., fishery closures.") (emphasis added) (internal citation omitted).

the Deepwater Horizon oil spill's true expanse and to calculate the toxicity of the released crude oil. Through the use of oil-transport modeling techniques with remote sensing data and in-water sampling, the study's authors have developed a framework to quantify the amounts of crude oil and the concentrations of accompanying polycyclic aromatic hydrocarbons at given locations on given dates and times. The simulations uncovered vast plumes of oil with toxic levels of polycyclic aromatic hydrocarbons, which had previously been overlooked by satellite imaging. The results show that satellites overlooked at least 30 percent of these hazardous and toxic plumes of crude oil, which appear to have affected large areas of the Gulf, including those where Plaintiff and other oil spill cleanup workers unwittingly worked at during the oil spill response. The following map provides a visual demonstration of some of the previously unaccounted for "invisible and toxic" oil compared to the known "visible and toxic" oil:



10)    Prior to the Invisible Oil Study, the known geographic extent and location of the crude oil released during the Deepwater Horizon oil spill had been determined mainly through satellite tracking conducted by the National Environmental Satellite Data and Information Service ("NESDIS").[9] However, as demonstrated in the Invisible Oil Study, this method significantly underestimated the extent of the Deepwater Horizon oil spill, as well as the concentrations of toxic substances (polycyclic aromatic hydrocarbons) contained in that oil.

11)    The Invisible Oil Study's findings call into question the accuracy of existing water sampling data in this case:

> [B]ecause of the patchy nature of the oil distribution in both time and space, many observations from multiple studies found no evidence of oil. Even within a radius of 10 km of the Macondo well during the oil spill, ~52% of the water samples were below PAH background level (26). This is important when weighing "no indication of oil" versus "positive indication of oil." **In other words, when studies report that they found no evidence of contamination, it does not necessarily mean that oil was not present in the wider area. Therefore, reports of absence of oil, for example, in the LC (37) during July 2010, do not necessarily indicate that the area was free of oil, particularly since the methods used in that study were not sensitive to low oil concentrations . . .**
>
> **Similarly, oil slicks detected by satellites positively indicate the presence of toxic oil concentrations. Yet, when these slicks disappear, toxic concentrations may still be present (Fig. 2C) (38) and may persist for several days and weeks after the disappearance of satellite/areal signal (Fig. 1E) (38).** For example, an oil slick identified at the north part of WFS, east of Pensacola, which was tracked forward in time, showed that even after 11 days, plume core concentrations remained high (~150 ppb) yet undetectable by satellites (11), corresponding to toxic PAH concentrations of ~1.8 ppb (Fig. 1, A and B). Similarly, a small in situ oil spill experiment demonstrated high toxicity of dissolved and dispersed oil beyond the edges of an oil slick and after the slick was no longer visible (38).

Invisible Oil Study, **Exhibit E** (emphasis added).

---

[9]    *See e.g.* NOAA Emergency Response notice on Loop Current Location Relative to Oil Slick dated August 7, 2010, Attached as **Exhibit F**.

12)    Upon the study's release, Plaintiff's counsel immediately began the process of retaining the Invisible Oil Study's authors to apply this breakthrough methodology to human subjects involved in oil spill response work. However, after months of negotiation, Plaintiff's counsel was initially unable to retain authors Claire B. Paris or Igal Berenshtein due to logistical issues.

13)    In July of 2020, Plaintiff's counsel was ultimately able to retain one of the study's key researchers – Dr. Natalie Perlin, a researcher and scientist at the University of Miami's Rosentiel School of Marine and Atmospheric Science with a doctorate in Mesoscale Meteorology and Master's degree in marine and atmospheric science.[10] Dr. Perlin was retained for the purpose of applying the framework utilized in the Invisible Oil Study to: (1) quantify and locate previously unaccounted for amounts of crude oil relevant to the Plaintiff,  and (2) calculate corresponding levels of polycyclic aromatic hydrocarbons at the areas where the Plaintiff was working at on specific dates and times.[11]

14)    While Plaintiff counsel has been diligent in taking the steps necessary to admit this newly discovered evidence in Plaintiff's case, as well as hundreds of other clean-up workers and zone residents involved in the Deepwater Horizon oil spill, Plaintiff's experts require a reasonable additional amount of time to properly develop the complex framework and model calculations established in the study in order to apply it to factual

---

[10]    *See* Perlin Affidavit, Attached as **Exhibit G**.

[11]    Dr. Perlin has extensive experience in using computer systems for scientific research in the area of numerical modeling of atmospheric and ocean processes, numerical analysis, visualization tools of scientific data and has been involved in computer modeling and scientific programming for the past 25 years. Dr. Perlin received her PhD in Mesoscale Meteorology at Tel Aviv University in 2001, and her Masters in Engineering Meteorology at Russian State Hydrometeorological University in 1993.

circumstances of oil spill response workers' exposure to toxic substances during 2010.[12]

15)    Plaintiff's counsel represents hundreds of oil spill cleanup workers and zone residents pursuing BELO claims under the MSA. While Dr. Perlin is working on applying this newly discovered evidence to Plaintiff's case, Dr. Perlin is also working diligently on applying her research to Plaintiffs who were onshore clean-up workers, vessel workers, decontamination workers, and zone residents. Applying this newly discovered evidence to these other types of Medical Settlement Class Members necessitates retaining additional experts as each type of worker was exposed to these invisible and toxic plumes of crude oil in different ways, requiring additional scientific analysis and opinions. In short, in order to be able to apply this newly discovered evidence to the different kinds of workers involved in the oil spill response, Plaintiff's counsel is developing different teams of experts specific to each factually different form of exposure.

16)    The current deadline for Plaintiff to submit expert reports in this case, for *both* exposure and medical causation experts, is March 22, 2021.

17)    The Court has set a trial month of February 2022 and trial is not imminent.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 16(b) provides: "A schedul[ing order] may be modified only for good cause and with the judge's consent."[13] "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite

---

[12]    *See* Affadavit of Craig T. Downs, Attached as **Exhibit H.**
[13]    Fed. R. Civ. P. 16(b)(4).

the diligence of the party needing the extension."[14] This Court has considered six factors when determining whether a moving party has established good cause to modify a scheduling order to extend expert discovery pursuant to Rule 16(b)(4): "1) whether trial is imminent; 2) whether the request is opposed; 3) whether the non-moving party would be prejudiced; 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court; and 6) the likelihood that the discovery will lead to relevant evidence."[15,16]

This Court may also employ Rule 6(b) to extend Plaintiff's expert deadline for one month. Federal Rule of Civil Procedure 6(b)(1)(A) gives the court "wide discretion to grant a request for additional time that is made prior to the expiration of the period originally prescribed."[17] Federal Rule of Civil Procedure 6(b)(1) provides: "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or

---

[14]  *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417 (11th Cir. 1998); *see also S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 535 (5th Cir. 2003); *see also Rogers v. Hartford Life & Acc. Ins. Co.*, No. CIV.A. 12-0019-WS-B, 2012 WL 2395194, at *1 (S.D. Ala. June 22, 2012).

[15]  *Fletcher v. Great Am. Ins. Co.*, No. 3:09-CV-324-J-25JRK, 2010 WL 11507486, at *6-7 (M.D. Fla. Sept. 7, 2010); *see also Durden v. Citicorp Tr. Bank, FSB*, No. 3:07-CV-974-J-34JRK, 2008 WL 11318338, at *7 (M.D. Fla. Nov. 25, 2008); *see also Aviation Advisors Int'l, Inc. v. Transamerica Inv. Grp., Inc.,* No. 8:09-CV-588-T-23AEP, 2010 WL 11507331, at *2 (M.D. Fla. July 29, 2010).

[16]  These factors are similar to the factors used by the Eleventh Circuit upon judicial review of a denial of continuance. *See Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008) ("(1) the moving party's diligence in its efforts to ready its case prior to the date set for hearing; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; (4) the extent to which the moving party might have suffered harm as a result of the district court's denial.") (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1296 (11th Cir.2005)).

[17]  *See* 4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1165; *see also Osberg Const. Co. v. United States*, 3 Cl. Ct. 652, 655 (1983) ("the courts are permitted wide discretion under Rule 6(b) . . . to grant motions for enlargement of time when substantial interests of justice will be served by doing so.").

its extension expires."[18]   Under Rule 6(b), "[a] request for an extension, made before the expiration of the deadline, should be granted where good cause is shown."[19] "'Good cause' is a non-rigorous standard that has been construed broadly across procedural and statutory contexts."[20] The "good cause" requirement, for purposes of Rule 6(b), is "to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits."[21] "[R]equests for extensions of time made before the applicable deadline has passed should 'normally . . . be granted in the absence of bad faith on the party of the party seeking relief or prejudice to the adverse party."[22]

## III. UNDER RULE 16(B)(4), GOOD CAUSE EXISTS TO GRANT AN EXTENSION DUE TO THE DEVELOPMENT OF NEWLY DISCOVERED SCIENTIFIC EVIDENCE DIRECTLY RELEVANT TO AN ESSENTIAL ELEMENT OF PLAINTIFF'S CASE.

### A. Plaintiff has been diligent but requires additional time to comply with the Scheduling Order in order to develop and admit newly discovered evidence.

"The Federal Rules of Civil Procedure strongly favor full discovery whenever possible."[23] Although the Eleventh Circuit has defined the good cause standard to require diligence, "it has never foreclosed the possibility that good cause can be demonstrated by facts external to the parties' conduct . . . the term 'good cause' is broad enough to permit the Court to grant the request for other reasons."[24] Plaintiff's explanation for the inability

---

[18]  Fed. R. Civ. P. 6(b)(1).

[19]  *Sensi v. Fla. Officers of Court*, 737 F. App'x 433, 436 (11th Cir. 2018).

[20]  *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir. 2010).

[21]  *See id.* (quoting *Rodgers v. Watt*, 722 F.2d 456, 459 (9th Cir. 1983)).

[22]  *Id.* (quoting 4B C. Wright & Miller, Fed. Practice and Procedure § 1165 (3d ed. 2004)).

[23]  *Aviation Advisors Int'l, Inc. v. Transamerica Inv. Grp., Inc.,* No. 8:09-CV-588-T-23AEP, 2010 WL 11507331, at *2 (M.D. Fla. July 29, 2010) (holding that the moving party "was diligent enough" to grant an extension of time to complete discovery even though "he could have been more proactive") (quoting *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985).

[24]  *See Auto-Owners Ins. Co. v. Ace Elec. Service, Inc.*, 648 F.Supp.2d 1371, 1377-78 (M.D. Fla. 2009) (citing *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)); *see also Perry*, No. 3:09-CV-403-J-34JRK, 2010 WL 11519881, at *2 (M.D. Fla. Sept. 1, 2010).

to meet the expert disclosure deadline set in the Scheduling Order weighs in favor of a modification to Plaintiff's expert disclosure deadline because Plaintiff's expert requires additional time to develop opinions on the central issue in dispute in this case. The basis for those opinions were only recently accepted by the scientific community in February of 2020; and Plaintiff has been diligently working to incorporate this new scientific evidence since discovery. As described above, new evidence as to the level of Plaintiff's PAH exposure was published just eight months ago – after Plaintiff filed suit, but well before Plaintiff's deadline to submit expert reports. This evidence is directly relevant to what is the *single most disputed issue* in this case: "the level and duration of the [Plaintiff's] exposure to oil, other hydrocarbons, and other substances released from the MC252 WELL."[25] Defendant denies that Plaintiff was exposed to *sufficient* levels of toxic substances to have caused a Later Manifested Physical Conditions because all of the presently available data, collected in part by contractors for BP and with inadequate methodology, inherently does not allow for the type of precise calculations of measures of exposure to toxic substances at levels sufficient to cause injury that the district courts require. The outdated data has been consistently relied on by BP experts to render opinions that *no amount* of exposure by BP response workers during 2010 would be enough to establish a dose of exposure for *any* claimant required to survive summary judgment.

Pursuant to the Master Settlement Agreement, the Defendants have plainly agreed to permit the litigation and presentation of evidence on this issue. Thus, Plaintiff is entitled to present relevant evidence as to the level and duration of his exposure to those toxic substances and *must do so* in order to establish causation in this case and allow the case to

---

[25]    MSA § VIII(G)(3)(a)(iii).

11

be adjudicated.[26] However, this is only the first required step because expert opinion testimony regarding exposure must be secured and provided to Plaintiff's other medical expert so Plaintiff can meet his burden on medical causation.

The pollutants and chemical dispersants released during the Deepwater Horizon Incident were "invisible" when the medical settlement agreement was finalized, when the parties agreed to the CMO, and when the Scheduling Order was set in this case. The true extent of the BP oil spill, and total picture of the environmental magnitude of the Deepwater Horizon Incident, has recently been developed through intense scientific work using state-of-the-art science. The ability to observe oil on the water, and accurately locate samples for measurement, was limited during 2010 by the dispersed nature of the oil because the chemicals dispersants used by BP had the intended effect of breaking the oil up and reducing surface visibility. Plaintiff has successfully retained one of the scientists who brought to light a scientific method to measure the oil that was hidden from plain human view, and hidden from most of the data gatherers (some paid for by BP through subcontractors) that produced the databases relied on by the experts of both parties.

The extent to which BP's choice to apply dispersants hid the extent of the oil spill and surface visibility of oil will ultimately be a question for the jury. However, the visibility of the oil during the 2010 BP Spill had a direct impact on data collection and the ability to create meaningful data that could be used in future BELO cases for claimants who were exposed during the 2010 Oil Spill but developed latent medical conditions. The

---

[26] Although the circuit courts have not clarified the standard of causation for a BELO case; typically, to carry the burden in a toxic tort case requires that "a plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.'" *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005).

methodology that revealed the presence of "invisible and toxic" oil in the areas where Plaintiff worked during the BP Oil Spill response was only made public on February 12, 2020 with the publication of the Invisible Oil Study.[27]

As is noted above, prior to this University of Miami report being accepted by the scientific community, Plaintiff diligently made inquiry into the application of this scientific study to the existing BP litigation. Immediately upon publication of the Invisible Oil Study and the acceptance by the scientific community of its methodology,[28] Plaintiff's counsel continued its efforts to apply this study to Plaintiff's case. These efforts included, but were not limited to, retaining the authors of the study, and applying this methodology to the BP Oil Spill responder claimants. Despite the upheaval in academic institutions caused by the COVID-19 pandemic, Plaintiff was ultimately able to retain one of the study's key scientists in July of 2020. Since that time, and in the midst of a pandemic that has impacted the procedures and business of the courts and Plaintiff's counsel ability to efficiently conduct its normal course of business including pursuit of the various parties associated with the February 2020 study, Dr. Natalie Perlin has still been working to develop a model that applies the methodology used in the Invisible Oil Study in order to quantify the level and duration of Plaintiff's PAH exposure, corresponding to Plaintiff's dates, times, and locations during oil spill response work.

Although Plaintiff acted diligently to obtain this evidence, it will take an additional, yet reasonable, amount of time to properly develop the framework and model established in the study in order to apply it to factual circumstances of oil spill response workers' exposure

---

[27] *See* Perlin Affidavit ¶ 8-9, **Exhibit G**.
[28] Although recently published, the Invisible Oil Study has now been cited by at least eleven other peer-reviewed scientific publications at this time.

to toxic substances. The timing of the release of new evidence on the presence of "invisible and toxic" oil in areas of oil spill response work was not in the control of the Plaintiff – there is nothing Plaintiff could have done to accelerate the release of this report or the evolution of science, or its transference to Plaintiff's medical causation experts.

To date, and despite diligent efforts, Plaintiff's counsel has been unable to effectively meet the high threshold for establishing a reliable quantified measure of exposure and allow Plaintiff's claim to be adjudicated on the merits by the trier of fact. Counsel for Plaintiff has produced expert disclosures in other BELO cases and has produced general causation expert reports for the bellwether cases in the Northern District of Florida. All such efforts have thus far been fruitless as Judge Rodgers recent ruling on summary judgment[29] and the Fifth Circuit in *McGill*[30] have clarified for the BP litigation. These recent rulings demonstrate that despite  counsel's diligence in producing expert reports that rely on theories of measure of exposure by Plaintiff's expert Williams and Lemond, or on medical methodology that focuses on the medical history of the plaintiff before and after exposure during the BP Oil Spill; any future expert disclosure will ultimately be rejected by the courts without incorporating the new science discovered and published in the Invisible Oil Study to generate a scientific and reliable measure  of exposure that can be shown to cause harm. Further, even if the law has *not* been recently been clarified for this BP litigation, there is still good cause to amend because of the recently discovered scientific state-of-the-art evidence.

Recently, Judge Atlas granted Plaintiff's counsel's motion to modify the CMO and

---

[29]     *See* Order on General Causation, *In re: Deepwater Horizon BELO Cases*, No. 3:19-cv-00963, Rec. Doc. 97 at 28 (N.D. Fla. Nov. 4, 2020).
[30]     *McGill v. BP Expl. & Prod. Inc.*, No. 1:18CV159-LG-RHW, 2019 WL 6053016 (S.D. Miss. Nov. 15, 2019), *aff'd*, No. 19-60849, 2020 WL 6038677 (5th Cir. Oct. 12, 2020).

extend expert disclosure deadlines for good cause shown.[31] In that case of *Alvarez v. BP*, the Southern District of Texas granted the requested 120 day extension and re-set the deadline for the plaintiff to produce expert disclosures from November 2, 2020 to March 2, 2021.[32] Additionally, the Southern District of Texas court modified the scheduling order accordingly in regards to the remaining deadlines.[33]

The Scheduling Order is not frivolous but should be liberally construed in light of the newly discovered science related to the "invisible oil" released during the 2010 BP Oil Spill that avoided detection by satellite imagery and field sampling. Plaintiff satisfies his burden under Rule 16(b) to provide sufficient explanation for his inability to meet the expert disclosure deadline and should not be held to a higher standard to show that he could meet the deadline through any possible means. Judge Myers in the Southern District of Mississippi granted the same plaintiff's motion to extend deadlines for good cause and found many of the Defendants' arguments on this issue "wholly unpersuasive."[34] As Judge Myers held:

> [T]he "new science" was only available in February 2020 and, as a consequence, within the knowledge of relatively few experts, giving the plaintiff few choices in expert selection. In turn, the plaintiff did not have the luxury of searching for experts that could quickly to produce an expert report using the newly-developed methodology. Additionally, considering the high demand for Perlin's services among other, similarly-situated plaintiffs, it is no surprise that the plaintiff would be slow to submit his expert report in this case. Experts only have so much time. Finally, the plaintiff is seeking for Perlin to apply the Invisible Oil Paper methodology to a new set of facts, which itself takes time to complete. Altogether, the first factor weighs heavily in the plaintiff's favor.

*See id*. at 3-4.

---

[31]    *See* Order on Plaintiff's Motion to Modify Court's Scheduling Order and/or Extend Time, *Alvarez v. BP*, No. H-19-2957, Rec. Doc. 40 (S.D. Tex. Nov. 19, 2020).

[32]    *See id.*

[33]    *See id*. at 2.

[34]    *See* Order Granting Plaintiff's Motion to Amend Scheduling Order, *Reeves v. BP*, No. 1:19-cv-00456-LG-RPM, Rec. Doc. 48, 4-5 (S.D. Miss. Nov. 24, 2020); attached as **Exhibit I.**

There is overarching preference in the federal courts to allow liberal construction of pre-trial scheduling orders. In *Lone Star*,[35] the Fourth Circuit reversed an order by a district court denying leave for the plaintiff to amend a complaint after the deadline had passed because good cause was shown under Rule 16(b) *solely* by the uncovering of previously unknown facts that surfaced only *after the deadline had passed.*[36] The Fourth Circuit found good cause for deviation from the pleading amendment deadline based solely on newly discovered evidence because pre-trial scheduling orders are to be liberally construed.[37]

> Any other [than a liberal] construction of the pre-trial order would tend to unduly constrict the trial of the case and defeat the central and salutary purpose of the Federal Rules of Civil Procedure to insure the trial of every lawsuit on its merits . . . . It is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality.

*In re Lone Star Indus.*, 19 F.3d, at *5 (quoting *Century Ref. Co. v. Hall*, 316 F.2d 15, 20 (10th Cir. 1963)).

Since the release of the Invisible Oil Study, Plaintiff acted in all due diligence.[38] However, due to the novel and scientifically complex nature of this methodology, along with the challenge of applying it to the factual circumstances of these complex BP BELO cases, Plaintiff requires additional time to comply with the expert disclosure deadline outlined in the scheduling order. Accordingly, Plaintiff requests a short extension of the

---

[35]  *See* Plaintiff's Memorandum in Support of Motion Continue Trial and Modify Scheduling Order, Rec. Doc. 20-1 at 15-16 (citing *In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litig.*, 19 F.3d 1429 (Table) (4th Cir. 1994).

[36]  *See In re Lone Star Indus.,* 19 F.3d at *11 ("[I]t is implicit in the district court's ruling that some of the evidence needed by Lone Star to prove its new . . . claim did not surface until after the amendment deadline. This alone justifies a finding of good cause under Rule 16(b).") (internal citations omitted).

[37]  *See id.* at *4-5.

[38]  District courts should evaluate the relative diligence of the party seeking the modification of the scheduling order. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (finding lack of requisite diligence where Rule 16 motion was filed more than a year after the expiration of the scheduling order deadline and six weeks before trial).

expert disclosure deadlines.

### B. Granting the Motion is Necessary to the Proper Adjudication of the Issues.

The importance of the modification and likelihood of producing relevant evidence weighs in factor of modification to the court's Scheduling Order. The modification requested here is fundamental to the adjudication of justice in this matter. Such a modification would allow the Plaintiff's experts the time required to finalize the application of this study, and its methodology, to these BP BELO cases. This newly discovered evidence is necessary to prove essential elements of Plaintiff's case. As agreed to by the parties under the Master Settlement Agreement, both parties shall be allowed to litigate "the level and duration of the [Plaintiff's] exposure to oil, other hydrocarbons, and other substances" released from the MC252 Well, and the *Deepwater Horizon* and its appurtenances, and the timing thereof.[39]

The ability to view the relevant data on occupational exposure for BP cleanup workers and responders has meaningfully changed due to scientific advancement and new discoveries. What was "invisible" during 2010, and at the time the scheduling order was set, is now visible to experts in the relevant fields whose testimony will be essential to establish the dose of exposure necessary to allow the trier of fact to make a determination on reliable evidence regarding dose and causation.

Defendants deny that Plaintiff was exposed to sufficient levels of toxic substances to have caused Plaintiff's Later Manifested Physical Conditions. Plaintiff must offer proof as to the levels and duration of Plaintiff's exposure in order to establish specific causation in this case. This new evidence that the Plaintiff anticipates finalizing will be the most accurate

---

[39] *See* MSA § VIII(G)(3)(a)(iii).

scientific evidence to date and will significantly contradict BP's theory that the Plaintiff did not suffer enough exposure to cause injury; as well as contradict the unreliable publicly available sampling data.

The Scheduling Order should be modified to serve the interests of judicial economy and ensure a just decision on the merits. Expert discovery in this case has not taken place yet. If Plaintiff is not able to proffer sufficient expert testimony to meet the standard of proof for causation as it relates to environmental exposure, BP will file a motion for summary judgment. Thus, it is appropriate to modify deadlines to submit expert disclosures so that the parties do not engage in  effort and expense to litigate stale scientific causation evidence when new data has recently been uncovered that will influence and change the opinions of the experts of both parties. Proceeding in a manner without reliable expert testimony that the district courts require to establish a dose would waste the resources of the parties and this Court. Further, if the Court finds that Plaintiff has made an adequate showing of diligence, the complex nature of this multidistrict litigation and ability for additional expert discovery to enlarge the chances of settlement should weigh in favor of granting Plaintiff's Motion.[40]

It is less prejudicial to amend the Scheduling Order *before* the relevant deadlines expire so that Plaintiff is not required to move to supplemental his expert disclosures after the expert disclosure deadline.[41] Even an untimely expert disclosure of this new evidence should not be

---

[40]  *See Oliver v. M/V BARBARY COAST*, No. CA 11-223-KD-C, 2012 WL 642342, at *1 (S.D. Ala. Feb. 28, 2012) (finding good cause under Rule 16(b) to modify the scheduling order and extend expert disclosure deadlines where the "sole reason" proffered for the requested extension was the desire to reduce litigation expenses and facilitate potential settlement).

[41]  Plaintiff states that even a late disclosure of Dr. Perlin would be harmless because there is no surprise and the trial is not imminent. *See Lamonica v. Hartford Ins. Co. of the Midwest*, No. 5:20-CV-63-TKW/MJF, 2020 WL 6695198, at *3-4 (N.D. Fla. Nov. 5, 2020) ("A discovery violation is more likely to be harmless when the injured party was provided some knowledge of the relevant information . . . [and] when a trial is not imminent, a failure to disclose evidence or an expert is more likely to be harmless.").

excluded.[42] Thus, an extension of Plaintiff's deadline would avoid the waste of resources of all parties and the Court, as Plaintiff's expert could be forced to supplement written expert reports without an extension. A modest extension at this stage would avoid prejudice from late extensions and prevent unnecessary untimely supplementation and motions practice.

Dr. Perlin's new scientific model is relevant to Plaintiff's claim and is reliable because Dr. Perlin's model is based on research conducted by qualified scientists that was published in a peer-reviewed journal using generally accepted scientific methods. BP's arguments as to the importance and relevance of the study go purely the weight of the evidence and is best addressed during cross-examination at trial.[43] As explained by Judge Myers in *Reeves v. BP*, the factor of 'importance' of the proposed evidence should be separated from the factors in *Daubert* because Defendants should not have two bites at the apple.[44] Whether the new science can reliably be applied to human toxicity is a matter for a later *Daubert* motion and does not implicate the importance of the new evidence because the absence of a scientific measure of exposure using this new science from the Invisible Oil Study would likely lead to dismissal due to the uselessness of the available field data taken during 2010 using flawed sampling methodologies. These issues need further discovery considering the new evidence discovered in 2020 of the "invisible" oil that was not originally detected in 2010.

The state-of-the-art scientific model being developed by Dr. Perlin to evaluate

---

[42]  *See id.* at 4 ("When evidence from an expert witness is important to a litigant's case and a late disclosure caused no prejudice to the opposing party, a court should not exclude the witness from testifying.") (citing *Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 235 (5th Cir. 1981); *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201-02 (3d Cir. 1978)).
[43]  *See In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, No. 1:08 GD 50000, 2013 WL 587655 (N.D. Ohio Feb. 13, 2013), *aff'd sub nom. Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) (opining that plaintiffs were entitled to present newly developed scientific theories in supplemental expert reports based on new science or research and that the defendant's challenges to the new science should be properly made during trial during cross-examination).
[44]  *See Reeves*, No. 1:19-cv-00456-LG-RPM, Rec. Doc. 48 at 2 n.2.

exposure concentrations for BELO claimants is *more* reliable that the data that exists in the status quo relied upon by BP experts because that existing data is not only stale but patchy "in both time and space" and does not give a complete picture of the contamination caused by the oil spill.[45] Additionally, since the Invisible Oil Study was peer-reviewed and made available to the scientific community, there have been no studies published that contradict the findings. At the time of the Invisible Oil Study's publication, there had been "no published case of cumulative DWH [Deepwater Horizon] spatial extent from oil transport models[] contradicting the extent presented [in the Invisible Oil Study]."[46] Although published February 12, 2020, the Invisible Oil Study has been cited by at least eleven other peer-reviewed scientific publications as of the time of this filing.

If Plaintiff's motion is denied, it would result in the functional equivalent of exclusion of an essential witness to Plaintiff's case, unfair prejudice to Plaintiff, and would likely be dispositive.[47] The deadline currently set in this Courts Scheduling Order cannot reasonably be met without sacrificing scientific certainty, and subsequently the ability for Plaintiff to produce scientifically reliable evidence and testimony that satisfies the Federal Rules of Civil Procedure, *Daubert*, and Federal Rules of Evidence. The deadline for expert disclosures currently set in the Scheduling Order will inevitably bottleneck a critical expert to Plaintiff's case, especially considering the numerous other BELO cases where scheduling orders have been modified and reset Plaintiff's counsel's expert disclosure deadlines to April. The

---

[45] *See* Invisible Oil Study at 6, **Exhibit E**.

[46] *See* Invisible Oil Study at 6, **Exhibit E**.

[47] *See Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010) (affirming a finding of good cause for a late amendment to pleadings to include lost profits in order to prevent substantial injustice where plaintiff would otherwise have no remaining theory of recovery); *see also Durden v. Citicorp Tr. Bank, FSB*, No. 3:07-CV-974-J-34JRK, 2008 WL 11318338 (M.D. Fla. Nov. 25, 2008) (granting motion to re-open and extend expert discovery where the expert was "crucial, perhaps even essential, to [p]laintiff's case, and excluding his testimony could be dispositive.").

complexity of each individual case places an enormous burden on Plaintiff and Dr. Perlin to calculate PAH levels to a reasonable degree of scientific certainty. Given the number of scheduling orders extended for other BELO plaintiffs, this funnel of work is anticipated to overwhelm Plaintiff's expert and Plaintiff respectfully requests a modest extension of a month so that Plaintiff's experts may provide the necessary complete scientific opinions to prove exposure to PAH resulting from the Deepwater Horizon Incident.

Here, PAH exposure is anticipated by undersigned to be the primary alleged causative chemical agent for Plaintiff's particular condition, notwithstanding the toxic effects of benzene, chemical dispersants and other toxic substances. Plaintiff requires an extension of his expert disclosure deadline to have adequate opportunity to complete expert discovery and ensure that Dr. Perlin can provide a narrative (and not simply raw data with incomplete analysis) to assist the trier of fact. This new science will be crucial to Plaintiff's case, and a modest extension before deadlines are imminent would not prejudice BP considering the numerous other BELO Plaintiffs who have been granted similar relief to incorporate and adapt this new science.

Plaintiff's expert witness can provide evidence necessary to satisfy a fundamental element of the case to prove exposure during the 2010 Oil Spill.[48] The Fifth Circuit recently confirmed the evidentiary burden on plaintiffs in BELO cases regarding exposure and opined that the reliance on purely medical opinions to establish causation, without expert opinion testimony concerning the extent of the harmful level of exposure to COREXIT and oil, would not be sufficient to withstand summary judgment.[49] This was the same conclusion reached by

---

[48]    *See* MSA § VIII(G)(3)(a)(iii); *see also McGill v. BP Expl. & Prod. Inc.*, No. 1:18CV159-LG-RHW, 2019 WL 6053016 (S.D. Miss. Nov. 15, 2019), *aff'd*, No. 19-60849, 2020 WL 6038677 (5th Cir. Oct. 12, 2020).
[49]    *See McGill,* 2020 WL 6038677 (5th Cir. Oct. 12, 2020).

Judge Rodgers in the Northern District of Florida in granting summary judgment against numerous bellwether plaintiffs on general causation.[50] Thus, the importance of the evidence that could be proffered by Plaintiff's newly retained expert witness weighs heavily in favor of modification of deadlines and against the functional exclusion of the expert witness's testimony concerning her state-of-the-art scientific model that is essential to establish a scientific assessment of exposure in an environmental mass toxic tort case. Without a modification of the expert disclosure deadline, Plaintiff would be unable to generate the type of measure of exposure that is required by the district courts in BELO cases and would be excluded from seeking his day in court.

As the evidence Plaintiff seeks to admit is highly relevant as to an essential element of the case, as well as calling into question the accuracy of existing data as to the levels of Plaintiff's exposure, there is good cause for the requested modification because it would allow the most accurate, state-of-the-art, scientific evidence to be employed and ensure that the case is tried on the merits. Accordingly, Plaintiff's requested modification should be granted.

### C. No Prejudice Would Be Caused by the Modification.

The modification to the scheduling order requested by Plaintiff would not prejudice BP and the Motion is unopposed. The trial date of February 2022 is not imminent and thus the trial date would not *need* to be changed by a modification to the Scheduling Order regarding expert disclosure dates. The requested modification will not prejudice the Defendants because BP's experts will have additional time to formulate their opinions of this

---

[50]    *See* Order on General Causation, *In re: Deepwater Horizon BELO Cases*, No. 3:19-cv-00963, Rec. Doc. 97 at 28 (N.D. Fla. Nov. 4, 2020) ("[S]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden.") (quoting *McClain*, 401 F.3d at 1241; *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)).

case than they would have had absent the modification should Plaintiff's Motion be granted, and the trial is not imminent.

Any possible prejudice to the Defendants is cured by the additional time BP would have to prepare expert reports, or by a continuance of the trial date should the Court find necessary. Additionally, BP would only be required to conduct the same discovery they would have conducted if Plaintiff filed his expert reports on the date listed in the Scheduling Order.[51] "The [D]efendants' impression that the plaintiff's sought expert is unqualified and will 'burden' the defendants with engaging in additional motion practice, *i.e.* a *Daubert* motion, is a highly speculative concern at best."[52] Even if there is a slight risk of potential prejudice caused by Plaintiff's inability to produce expert reports by the deadline set in the scheduling order, a continuance of all applicable deadlines should be granted to cure potential prejudice if Plaintiff has shown good cause under Rule 16(b).[53] A continuance is the preferred means to cure the risk of any potential prejudice to BP; and a continuance in this case will benefit all the parties and could prevent the exclusion of vital evidence.[54]

Despite Plaintiff's diligence, it is impossible to develop Dr. Perlin's oil transport and fate model underlying the Invisible Oil Study to a reasonable degree of scientific certainty and to the specific parameters of the Plaintiff's time and location in time to comply with the

---

[51]    *See Reeves*, No. 1:19-cv-00456-LG-RPM, Rec. Doc. 48 at 5, n.3 ("The [D]efendants appear not to have deposed the plaintiff's medical causation expert yet—suggesting that the only "additional" deposition-related discovery that the defendants will do is the same discovery they would have conducted if the plaintiff filed all expert submissions on [Plaintiff's expert disclosure deadline].").

[52]    *See id.*

[53]    *See Matute v. BP Expl. & Prod., Inc.*, No. CV 19-595, 2020 WL 4529838, at *2 (E.D. La. June 23, 2020).

[54]    "[C]ontinuance is the preferred means of dealing with a party's attempt to designate a witness out of time." *See Betzel v. v. State Farm Lloyds*, 480 F.3d 704, 708 (5th Cir. 2007) (citing *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir. 1998)); *see also E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116 (5th Cir. 1993) ("We have emphasized that continuance, not exclusion, is the preferred means of dealing with a party's attempt to designate a witness out of order or offer new evidence.").

Case Management Order absent an extension of the expert disclosure deadlines.[55] Since Plaintiff has been diligent in developing the newly discovered scientific evidence and retaining Dr. Perlin, one of the authors of the Invisible Oil Study; the importance of the evidence, lack of prejudice to the Defendants, and other factors discussed above warrant a modification of the Scheduling Order to allow for the case to be tried on the merits instead of being due to be dismissed because of the inability of the stale scientific data to provide a reliable measure of exposure as required by the courts.

### III. UNDER RULE 6(B)(1), GOOD CAUSE EXISTS TO GRANT THE REQUESTED EXTENSION.

Under Rule (6)(b)(1), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time … with or without motion or notice if the court acts, or if a request is made, before or the original time or its extension expires."[56] "Rule 6(b)(1)(A) gives the court wide discretion to grant a request for additional time that is made prior to the expiration of the period originally prescribed."[57] Under Rule 6(b), "[a] request for an extension, made before the expiration of the deadline, should be granted where good cause is shown."[58] Requests for extensions of time "made before the applicable deadline has passed should "normally . . . be granted in the absence of [1] bad faith on the part of the party seeking relief or [2] prejudice to the adverse party."[59]

---

[55]  Given the burden of producing written reports for a number of other BELO plaintiffs with newly extended Scheduling Orders, it is also anticipated that any report produced by Dr. Perlin pursuant to the current Scheduling Order could be devoid of necessary narratives or a complete statement of all of Dr. Perlin's opinions pursuant to Rule 26.

[56]  Fed. R. Civ. P. 6(b)(1).

[57]  4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1165; *see also Osberg Const. Co. v. United States*, 3 Cl. Ct. 652, 655 (1983) ("the courts are permitted wide discretion under Rule 6(b) . . . to grant motions for enlargement of time when substantial interests of justice will be served by doing so.").

[58]  *Sensi v. Fla. Officers of Court*, 737 F. App'x 433, 436 (11th Cir. 2018).

[59]  *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir.2010) (emphasis added) (quoting 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1165 (3d ed. 2004)).

24

Good cause to grant the requested extension exists under Rule (6)(b)(1) for the same reasons applicable to Rule (16)(b), as listed and explained above. There has been no "bad faith" on the part of the Plaintiff. Plaintiff has worked diligently to develop this newly discovered evidence into admissible evidence and to avoid unnecessary delays. Also applicable to Rule 6, BP will not be prejudiced by the extension as the trial is not imminent and they will have additional time to respond to Plaintiff's experts and prepare their case.

## IV. CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff's unopposed Motion to modify the Scheduling Order pursuant to Federal Rule of Civil Procedure 16(b) by re-setting Plaintiff's expert disclosure deadline to April 23, 2021, re-setting the Defendants' expert disclosure deadline to July 23, 2021, and extending the discovery deadline from August 13, 2021 to August 27, 2021; or in the alternative, extend the time for the parties to comply with the aforementioned deadlines in the Scheduling Order pursuant to Federal Rule of Civil Procedure 6(b) and grant any further relief this Honorable Court deems just and proper.

Respectfully Submitted,

By:  /s/ Jason M. Larey
JASON M. LAREY, FL BAR #1019237
**THE DOWNS LAW GROUP, P.A.**
3250 Mary Street. Suite 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: jlarey@downslawgroup.com

*Attorney for Plaintiff*

25

**LOCAL RULE 3.01(g) CERTIFICATION**

I hereby certify that counsel for Plaintiff has conferred with counsel for the Defendants in an effort to resolve the issues raised by this Motion and counsel for the Defendants does not oppose the relief sought herein.

*/s/ Jason Larey*
JASON LAREY

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of January 2021, a true and correct copy of the foregoing instrument was filed with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

*/s/ Jason Larey*
JASON LAREY